## CHARLES RUCKER *v.* THE STATE.

1. IMPEACHING A WITNESS. *Rule as to leading questions.*

    Where a predicate has been laid for contradiction, the impeaching witness should be asked, in general terms, what the witness sought to be discredited said, without resort to leading questions. While there are exceptions—as, where the mind of the witness cannot be directed to the subject of inquiry without specification, or where particular expressions were used—the general rule is that it is not necessary or proper, in questioning the impeaching witness, to repeat the words employed in examining the witness sought to be impeached.

2. HOMICIDE. *Deceased a convict of a misdemeanor. Self-defense. Instructions.*

    On a trial for murder, the accused cannot complain of instructions which announce that, although the deceased was an illicit liquor dealer, and had escaped from confinement in the county jail for a misdemeanor, he was not an escaped felon, and was not deprived of the right of self-defense.

FROM the circuit court of Tippah county.

HON. EUGENE JOHNSON, Judge.

Appellant was indicted for the murder of one Saunders, and was convicted of manslaughter. It appears that, early on the morning of the day of the killing, a younger brother of appellant reported that he had been cursed and shot at by some one who was unknown to him at the time. Thereupon this younger brother and C. C. Rucker, his father, and one Cy Rucker, a negro, went in search of such person. They met appellant, Dr. Rucker, and learning the direction that the man had gone whom they were informed had done the shoot-

ing, the elder Rucker proposed that all the parties should go together and arrest him and take him before a magistrate, to have investigated the charge of his having shot at young Rucker. The man they were in pursuit of, and who afterwards turned out to be Saunders, had a gun, and it was shown that appellant was informed that he, Saunders, stated that he would shoot any one coming near him who was not a whisky man. The pursuit being determined upon, the appellant and his father and brother, together with one Kelly and the negro, Cy, all armed with guns, followed in the direction the man was seen to go. When they reached a thicket, into which he had been seen to enter, and through which ran a ditch or branch, the elder Rucker called out aloud: " If there is anybody in there, come out! We don't want to hurt you! We want to carry you to 'Squire Smith's, and see what you mean by shooting at my boy!" No response being made, they began a search. Appellant exchanged guns with his father, and Cy was told to go to the ditch and look down it, and appellant went to another point on the ditch about thirty yards distant.

Here there is conflict in the evidence. The defendant testified that when he reached the ditch he slipped and fell in, and immediately heard what sounded like the bursting of a cap, and, looking up, saw a man lying in the ditch with a gun pointing towards him; that he called out to the man to hold up his hands or he would shoot; that this was not heeded, and, instead, he heard what he took to be the click of a gun-lock, when he fired both barrels of his gun at the man and jumped out of the ditch; that the man groaned several times, and he saw the muzzle of the gun turn in the direction of Cy, when he said to him, " Look out, he is going to shoot you! Shoot him!"; that Cy responded, " I see him," and, after telling the man to hold up his hands, which was not done, fired at him twice; that the groaning ceased, and the party went for a magistrate without making any examination of the body; that he shot deceased in self-defense, be-

lieving his life was in danger. This testimony was corroborated, in substance, by appellant's father and brother and Kelly, witnesses for defendant. There was evidence to show that the deceased was shot in the back and side, and the defendant testified that he thought his shot struck him. His gun was loaded with buck-shot.

Cy Rucker was introduced by the state, and testified that when told to look down the ditch he did so, and saw the man lying down, but that he waved his hand and shook his head, indicating to witness not to make his presence known; that he went back and reported that he had not seen any one, but was directed to look again; that he did so, and when appellant shot, deceased said, "Lord have mercy on me!"; that defendant then said, "He is trying to shoot you! God damn you, if you don't shoot, I'll shoot you!"; that he then fired, but did not try to hit deceased, and that if any of the shot struck him they scattered greatly.

This witness was subsequently re-introduced by the state, and testified that, after the killing, the defendant went down into the ditch and kicked the body of Saunders, and said: "God damn you, you caused me and pa to fall out!"; that he then changed the position of Saunders' gun, pointing it in the direction witness had stood, after cocking one barrel, and told witness not to tell any one, but to swear like he did. It was shown that the witness had testified before the coroner's jury and the grand jury and on *habeas corpus* trial not adversely to defendant, and that he had never before mentioned the things brought out on his last examination. He stated, however, that the reason he had not done so was that he was afraid of the defendant. The defendant denied these statements of the witness, and the testimony was conflicting as to whether a cap on the gun of deceased had been exploded.

There was evidence going to show that deceased and one Crum were together in the morning, and that it was Crum, and not deceased, who shot at young Rucker.

It was shown that the deceased had, some time previous to

the killing, been convicted of a misdemeanor, and, having escaped jail, had never been recaptured and made to serve out his term.    It was also shown that he was engaged in the unlawful manufacture and sale of liquor.

On cross-examination, the witness, Cy Rucker, made the following statement: "Mr. Rucker didn't ask me why I shot, nor did I say that, instead of holding up his hands, Saunders was trying to shoot me."    The questions propounded to the witness are not given.    In giving the testimony of defendant as to this, the bill of exceptions contains the following statement: "'As soon as Cy shot, my father asked him what he had shot for.'    At this point the district attorney objected to witness stating what Cy answered, and the court sustained the objection."

On behalf of the state, among other things, the court instructed the jury that, although the deceased was an illicit distiller, and was an escaped convict, this did not justify his being killed, but could be considered only as showing why the deceased sought to avoid arrest; that, if the defendant was in good faith endeavoring to arrest deceased for a felony which the defendant had reason to believe had been committed, and, while attempting to make such arrest, he either carelessly or unnecessarily shot and killed deceased, when he was in no real or apparent danger, and when, with proper caution, he could have arrested the deceased without shooting him, he was guilty of manslaughter, although he may have been alarmed, and honestly supposed he was in danger of losing his life or of receiving some great bodily harm; that, if he did not honestly believe deceased had been guilty of felony, and was pursuing him dangerously armed, and killed him with a deadly weapon, then the law presumes malice, and defendant should be convicted of murder; that, if defendant was in good faith endeavoring to arrest deceased, whom he believed had committed a felony, he was held to the same degree of caution required of a public officer, and if he shot and killed deceased recklessly or unnecessarily,

when he was in no real or apparent danger of losing his life or of suffering great bodily harm, when he could have arrested him without shooting him, then he is guilty of manslaughter; that, if Cy Rucker shot deceased after defendant had unlawfully and fatally shot him, the defendant should not be acquitted on this ground; but, if the defendant's shots were fatal and with premeditation and malice, and not in necessary self-defense, the defendant is guilty of murder; or, if the defendant unnecessarily shot the deceased and fatally wounded him at a time when deceased was not resisting arrest or endeavoring to flee, or when it did not appear reasonably necessary to shoot him, although the defendant honestly believed he had committed a felony, he was guilty of manslaughter.

For the defendant, among other things, the court instructed the jury that, if, on the morning of the killing, one of two men, Crum or deceased, shot at young Rucker under such circumstances as reasonably led defendant and his father to believe that the man who did the shooting had committed a felony, and if they reasonably believed deceased was the man who had committed the act, and they acted in good faith and with the best lights before them, then they had the right to pursue and arrest him, and to employ any lawful means for this purpose, although it was afterwards shown that Crum, and not deceased, had done the shooting; that, if defendant endeavored to ascertain which of the persons did the shooting, and was informed that deceased had done so, and that he had been seen armed with a gun, and was pursued by defendant and his father, with the intent to arrest and deliver him to a peace officer for trial, and that they had reasonable grounds to believe that deceased had done the shooting, then they had a right to make the arrest without warrant by any lawful means; and if, in pursuance of this purpose to arrest, they found deceased concealed in a ditch, and that he had notice of the purpose to arrest him, and, when called upon to surrender, endeavored to shoot defendant, and it reasona-

bly appeared to defendant that it was necessary for him to shoot in self-defense or in order to make the arrest, and that the arrest could not be made without shooting, then the defendant had a right to shoot the deceased, or if there is a reasonable doubt as to the existence of these facts, the jury should acquit.

The defendant asked the court to instruct the jury that if Cy Rucker, and not defendant, killed the deceased, or if there was a doubt as to who fired the fatal shot, the jury shall acquit. This instruction was given after being modified by adding thereto the following: " unless the evidence shows Cy Rucker fired the shot at the instance and request of defendant. In this case, if Cy Rucker killed deceased unlawfully, then both defendant and Cy Rucker are guilty either of murder or manslaughter, as the proof may show."

The opinion contains such further statement of the case as is necessary to an understanding of the questions decided.

*Thomas Spight* and *John Y. Murray, Jr.*, for appellant,

Each filed a lengthy brief, discussing the evidence and the rulings of the court below, relying, in the main, upon the same authorities, and as to the question upon which the reversal was had, making the following points: Cy Rucker was a most important witness for the state. He was deeply interested, and, according to the theory of the state, was an accomplice. He had the strongest motive to convict the appellant—to protect himself. He was a confessed perjurer, having testified differently in each of the trials. There was a direct conflict between his testimony and that of the defendant as to what was said and done at the time of the shooting. All that was said and done constituted a part of the *res gestæ*, and was exceedingly important to the defendant. On this point, see *Meek* v. *Perry*, 36 Miss., 190 ; *Archer* v. *Helm*, 70 *Ib.*, 874 ; 7 So. Rep., 784.

As to the importance of admitting evidence of every thing that transpired at the time of the alleged crime, see *Scott* v.

*State,* 56 Miss., 287.  Every occurrence and circumstance, however trivial, which forms a part of the *res gestæ* may be consulted.  The single question is one of relevancy and pertinency, and not of force and value.  *Mixon* v. *State,* 55 Miss., 525;  19 Am. & Eng. Enc. L., 755.

If it is true, as contended by defendant, that he told Cy to shoot because deceased was about to shoot him, then both Cy and defendant had the right to shoot.  Code 1892, § 1152; 30 Miss., 619;  *Brabston* v. *State,* 68 *Ib.,* 208.

The predicate was laid for the contradiction of Cy Rucker, and there was no reason for refusing to allow him to be contradicted.  But the defendant had a right to show what he said at the time of the shooting without laying any foundation for contradiction.  *Mixon* v. *State, supra; Field* v. *State,* 57 Miss., 474;  *Spivey* v. *State,* 58 *Ib.,* 858.

A part of what was said at the time of the shooting had been brought out by the state, and defendant was entitled to have the whole before the jury.  53 Miss., 367;  56 *Ib.,* 287.

(Counsel also discussed at length the action of the court in giving and refusing instructions, but as these matters are not referred to in the opinion, except in a very general way, the argument of counsel and the authorities cited are omitted.)

*Frank Johnston,* attorney-general, for the state.

The alleged statement of Cy Rucker, giving the reasons for shooting, were not part of the *res gestæ.*  *Mayes* v. *State,* 64 Miss., 329;  *King* v. *State,* 65 *Ib.,* 576.  All that appellant said to Cy, and his reply, were admitted.

But, even if the evidence was improperly excluded, I urge that it was immaterial, and could not possibly have changed the verdict, as he was acquitted of murder, and a clear case of manslaughter was made out.  The defendant admitted that he had shot the deceased, and the evidence conclusively showed that he did the killing.  He was only found guilty of manslaughter, and the verdict as to this is overwhelm-

ingly sustained by the testimony. Therefore, the alleged statements of Cy Rucker, made after the defendant had shot the deceased, were wholly immaterial.

Argued orally by *Thomas Spight*, for appellant, and the attorney-general for the state.

Woods, J., delivered the opinion of the court.

All assignments of error are without avail, save one, and for this error we are constrained to reverse the judgment of the court below. On the cross-examination of the state's witness, Cy Rucker, the predicate was properly laid for the introduction of evidence to contradict his statement as to what was said by him in response to an inquiry made by C. C. Rucker of him, the witness, as to why he shot at the deceased immediately after he fired his gun. The matter on which it was sought to contradict was material. The conflict between the state's witness and the accused, as to the circumstances attendant upon Cy's shooting, was direct and violent. The state's witness testified that he shot under compulsion and to save his own life from threatened injury at the hands of the accused. This evidence of Cy was contradicted flatly by the prisoner's testimony, and, for the purpose of discrediting Cy, the foundation was laid, in his cross-examination, for the introduction of the contradicting statement said to have been made by him at the time of the commission of the homicide.

This impeaching evidence was competent, and the serious difficulty which confronts us is as to the manner in which it was sought to be introduced. The impeaching witness was to state, in general terms, what was Cy's answer when C. C. Rucker asked him what he (Cy) shot for. The witness was asked to state what Cy said, without repeating to him, in terms, the question which had been put to Cy in the laying of the predicate for his impeachment by the introduction of his contradictory statements made out of court. The ques-

tion to be determined is, was the general interrogation propounded to the impeaching witness the proper method of examination, or should the question have been put in the words employed in cross-examining the witness sought to be discredited? To state it in simpler and clearer form, should leading questions be permitted to be propounded by counsel to his own witness, who has been introduced to impeach an opposing witness, by showing that such adverse witness has made other and contradictory statements touching the material point to which he testified?

The question must be answered, generally, in the negative, and for several reasons. If the discrediting witness be really in possession and having memory of the particular contradictory statements supposed to have been made, and as to which he is called to testify, it will be quite enough to direct his attention to time, place and person, and the subject of the conversation in which the contradiction is thought to be found, and then ask, generally, what the witness sought to be discredited said. If he be truthful and of ordinary memory, this course of examination will be sufficient, usually, to secure the desired evidence. If he be untruthful, or without clear recollection, this course of examination will result in nothing, as, indeed, in such case, it should.

But again, the indulgence in leading questions of the character we are considering, where the very words are put into the impeaching witness' mind and mouth, suggests to the party's witness exactly what answer is desired by counsel, and what is necessary for him to say in order that the side calling him may put down a hurtful witness of the adversary party. As has been strikingly said, this method of examination supplies a forgetful witness with a false memory and a lying witness with a ready answer. And it is painfully unjust to the witness sought to be impeached to permit his veracity assailed, not by the clear and unaided evidence of a competent and trustworthy person, speaking his own mind and from his own memory, but by a dull or a willing tool, dexterously

supplied with evidence furnished him ready made in the form of leading questions.

To us it seems clear that the reasons for denying to a party the right to lead his own witness are of vigorous force in the very instances we are considering. There can be no danger of failure of justice in any case by pursuing the ordinary and approved course of examination, and, primarily, ask the impeaching witness what the other witness said, and not ask him whether the other said any particular words or used such and such language. See *Allen* v. *State*, 28 Ga., 395; *Gould* v. *Norfolk Lead Co.*, 9 Cush. (Mass.), 338; 2 Phil. Ev., ch. 1, § 10.

Greenleaf, in his invaluable treatise on evidence, states the exception to the general rule as we have laid it down, as follows: "In some cases, however, leading questions are permitted, even on direct examination, namely, . . . where the mind of the witness, from the nature of the case, cannot be directed to the subject of the inquiry without a specification of it—as, where he is called to contradict another as to the contents of a letter which is lost, and cannot, without suggestion, recollect all its contents, the particular passage may be suggested to him. So, where a witness is called to contradict another, who had stated that such and such expressions were used, or the like, counsel are sometimes permitted to ask whether those particular expressions were used, instead of asking the witness to state what was said." 1 Greenleaf on Ev., §§ 569–70. For the refusal of the court below to permit the defendant to answer the general question, "What did Cy answer when your father asked him what he shot for," we are forced to reverse the judgment and award a new trial.

The accused has no ground to complain of the instructions. The law was most liberally charged on his behalf. The deceased was not an escaped felon, and he was entitled to exercise the right of self-defense, even if he had fled and attempted to conceal himself from armed persons pursuing

71 Miss.—44

him for an offense he never committed. Grant that he was or had been unlawfully engaged in the manufacture and sale of distilled liquors, and that he had escaped from confinement in the county jail on conviction for a misdemeanor, this defendant and his armed fellow-pursuers were not aware of these small offenses, and they were not hunting him down to arrest him for these things. What these incidents and events had to do with the killing of the man, it is difficult to conjecture. They were illustrative of his timorous conduct in fleeing and hiding himself from his pursuers in the ditch where he met his miserable death, but we are perplexed to conceive in what way they shed light on the conduct of the accused.

The instructions, too, which left it broadly to the jury, on the evidence offered on the point, to say whether the prisoner did not have an honest belief that the deceased had committed a felony, were most favorable to the accused, under the facts in proof, seeing no inquiry was made by the accused, before the armed pursuit of the deceased was begun, of the Kellys, father and son, or any other person known to the accused, as to who fired on his brother in the road at Kelly's house early that morning, but the deadly chase of the hunted old man was begun on the false statement of the drunken youth who had actually fired that shot. The consideration of the question of diligence or want of diligence shown by the prisoner, in seeking to ascertain the person who had fired upon his brother, before taking up the armed hunt for the supposed felon, who might readily have been seen to be no felon, was wholly overlooked.

The instructions, too, which overlook, not to say by implication deny, to the dead man the right to defend himself against armed pursuers, whose avowed purpose was to arrest him and carry him before a magistrate for an offense he had not committed, and for which he had no reason to believe he was being hunted by these pursuers, armed with deadly weapons, persistent in their chase, and under circumstances, as

detailed by the state's witness, Cy Rucker, well calculated to arouse the liveliest apprehensions of danger in the mind of the deceased—these instructions are not to be complained of by this defendant.

*Reversed and remanded.*